UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CECILIA ONYINYE ONYEBUCHI,

     Plaintiff                    Civil Action No. 17-12270

v.                              HON. Stephen J. Murphy, III
                               U.S. District Judge
                               HON. R. STEVEN WHALEN
COMMISSIONER OF SOCIAL          U.S. Magistrate Judge
SECURITY,

     Defendant.

_____/

**REPORT AND RECOMMENDATION**

     Plaintiff Cecilia Onyinye Onyebuchi ("Plaintiff") brings this action under 42 U.S.C.
§ 405(g), challenging the final decision of Defendant Commissioner ("Defendant") that
Plaintiff's initial disability determination was fraudulently obtained.   Both parties have filed
summary judgment motions which have been referred for a Report and Recommendation
pursuant to 28 U.S.C. § 636(b)(1)(B).   For the reasons set forth below,  I recommend that
Defendant's Motion for Summary Judgment [Docket #21] be GRANTED and that Plaintiff's
Motion for Summary Judgment [Docket #18] be DENIED.

**PROCEDURAL HISTORY**

     On June 12, 2011, Plaintiff filed an application for Disability Insurance Benefits
("DIB"), alleging disability as of May 15, 2010 (Tr. 17, 351-352).   On December 7, 2011,
the SSA found that Plaintiff was disabled (Tr. 17).   However, in April, 2012 the Office of
the Inspector General ("OIG") opened an investigation based on an allegation of fraud filed

by Kristina Zwick, a case manager, accusing Plaintiff of "operating several unlicensed adult group homes" at the time of application process and while collecting benefits (Tr. 17).   On October 1, 2012, the OIG concluded that Plaintiff had defrauded the SSA "by misrepresenting her claim of disability" (Tr. 17, 55-92).   On May 19, 2013, the SSA reopened the previously approved application and denied her benefits due to fraud based on the finding that she had performed Substantial Gainful Activity ("SGA") within one year of becoming disabled  (Tr. 17, 133-137).

After the April 22, 2014 denial of the request for reconsideration (Tr. 139, 143), Plaintiff requested an administrative hearing, held on October 14, 2015 in Livonia, Michigan (Tr. 1029).   Plaintiff, represented by attorney Sarah Monro, testified (Tr. 1034-1043), as did vocational expert ("VE") John N. Stokes (Tr. 1044-1051)[1]   On June 24, 2016, ALJ Gasparovich found Plaintiff "provided false statements in an effort to obtain disability benefits" and "continued to operate multiple adult group homes during the period she applied for [] benefits and received them" (Tr. 21).   On June 21, 2017, the Appeals Council denied review (Tr. 4-6).  On July 12, 2017, Plaintiff filed for judicial review of the Commissioner's final decision in this Court.

## **BACKGROUND FACTS**

Plaintiff, born  November 22, 1958, was 57 when the ALJ issued her decision  (Tr. 21, 151).  She was originally granted benefits for the conditions of an affective disorder and

---

[1]

The VE's testimony is omitted from discussion.  The present controversy pertains exclusively to the finding that Plaintiff was not entitled to benefits because she "provided false statements in an effort to obtain" benefits and continued to receive benefits while performing Substantial Gainful Activity  (Tr. 21).

ischemic heart disease (Tr. 351).

### A.  Plaintiff's Statements and Hearing Testimony

#### 1.  Statements

Plaintiff was interviewed by OIG agents in June, 2012.  Prior to being asked questions, she offered that she was disabled, had been injured by a hospital where she was a patient, and could die "anytime" (Tr. 84).  Upon being questioned, she denied any involvement with the group homes since May, 2010 (Tr. 84).  She reported that her now-former husband and children ran the homes and that she had no connection to the homes "except to visit the homes sporadically" with her former husband and children (Tr. 84-85). She allowed that she sometimes received calls from social workers looking for placement for a client (Tr. 85).  She denied ever visiting the homes by herself since May, 2010 and disputed the statements by social workers and the family members of residents that they had met with her "one-on-one" and that she acted in the capacity of the owner of the group homes during the relevant period (Tr.  85); *see* OIG report, *below*.  She later stated that she sometimes had a friend drive her to the homes because she liked to talk to the residents (Tr. 86).  Plaintiff denied driving but stated that she had a chauffeur license because she was a "good driver" (Tr. 87).  She denied driving group home residents to the store, buying them food, or acting in a managerial capacity at the homes since May, 2010 (Tr. 87-88).

The following month, Plaintiff provided a statement to the SSA, stating that her name was on the bank account for the adult foster care business because before she got sick, she helped her husband and daughter in the group home business (Tr. 53).  She denied that she worked at the business after being disabled, but noted that she went to the group homes "a couple of days a week" to "talk to the residents" (Tr. 53).  She stated that the income reflected on her 2010 and 2011 tax returns was from reselling used clothing (Tr. 53).

## 2.  The Hearing Testimony

*Prior to her client's testimony, Plaintiff's counsel objected to the addition of the OIG's report to the transcript on the basis that "the entire document is hearsay and double hearsay"* (Tr. 1031).  *The ALJ responded that the report would be admitted but that the objection would "go to the weight given to the document"* (Tr. 1032).

Plaintiff then offered the following testimony:

She received a culinary arts degree from a community college but had never worked as a cook or chef (Tr. 1035).  The only work she had performed in the past 15 years was the group home work (Tr. 1035).  She started managing adult group homes after obtaining experience working at an "American House" facility (Tr. 1035-6).  She stopped working in 2010 after undergoing open heart surgery (Tr. 1037).  She also underwent therapy for bilateral shoulder injuries (Tr. 1037).  The condition of only one shoulder improved with therapy (Tr. 1037).

Plaintiff disputed the OIG report, noting that she was unable to lift even a gallon of milk (Tr. 1037).  After becoming disabled, she handed the business over to her daughter and former husband, adding that they called on her for help when they required use of her good interpersonal skills (Tr. 1038).  She had told others to remove her name from the business accounts (Tr. 1038).  She testified, in effect, that her involvement in the businesses was limited to accompanying her children to the group homes (Tr. 1038).

Plaintiff alleged that she continued to be disabled both mentally and physically, stating that she hallucinated that a snake was chasing her (Tr. 1038).  She alleged that the psychotropic medication prescribed by her mental health providers was making her hair fall out (Tr. 1038).  She stated that she had been hospitalized for two days for breathing problems around two or three months before the hearing (Tr. 1039).

-4-

Plaintiff reported that she accompanied her daughter on grocery trips and to group homes but denied working at the group homes (Tr. 1040-2). She testified that since the onset of disability, her former husband was the owner of the group homes (Tr. 1041). She claimed that before becoming disabled, she owned only one group home which was closed before she became disabled (Tr. 1041).

Plaintiff reported that she took Tramadol and Motrin for pain (Tr. 1043). She reported that physical therapists came to her house twice a week for the treatment of the shoulder condition (Tr. 1043). Prior to becoming disabled, Plaintiff owned her own group home and managed all of its paperwork (Tr. 1047).

**B. The OIG's October 1, 2012 Report**

The OIG investigation was opened following a fraud referral by Kristina Zwick ("Zwick"), an advocate working for Michigan Protection and Advocacy Service (Tr. 56). Zwick reported that Plaintiff was operating several unlicensed adult group homes in southeastern Michigan which had failed to provide residents with necessary services (Tr. 56). She reported that the business entities associated with Plaintiff were Qualicare Rehab Center, Inc. ("Qualicare"), Chinok Home Care, Inc. ("Chinok")  and Progressive Care Home Services ("Progressive") (Tr. 56). She reported that Plaintiff's husband and daughter were also involved in the operation of the homes (Tr. 56). The report noted that although Qualicare was incorporated by a different individual, an investigation revealed that Plaintiff was the actual owner and operator (Tr. 57). The report noted that Chinok was incorporated in 2007 by Plaintiff's daughter (Tr. 57). Zwick provided a July, 2010 Michigan Department of Human Services order revoking Chinok's license to operate in which Plaintiff's "substantial role and involvement" in the home was discussed (Tr. 68). She noted that at a June, 2011 meeting at one of the homes, Plaintiff identified herself to Zwick as "the

homeowner and manager" before excusing herself to go to a VA facility to recruit additional

residents for the home (Tr. 68).  Zwick provided additional documents noting that Plaintiff

was identified as the owner of a group home as of April, 2011 (Tr. 69).

The OIG report contains an October, 2010 police report regarding suspicious activity

in the neighborhood of one of the group homes which identified the owner of the group home

as Plaintiff (Tr. 77).  PNC Bank records from April 4, 2008 to May, 2012 showed that the

only authorized signer on the account of Chinok Home Care, Inc. was Plaintiff (Tr. 80).

### Additional OIG Interviews

In April, 2012, Arma Williams ("Williams") stated that Plaintiff, using the name

"CeCe Blessing" introduced herself as a group home provider in February, 2011 then went

on to discuss treatment plans for prospective residents (Tr. 58).  Williams noted that in April,

2011 and at a later meeting, she discussed the residents' treatment with Plaintiff (Tr. 58).

According to Williams, Plaintiff stated that she took the residents' Michigan Bridge cards

and used them to purchase food (Tr. 58).  After Williams made a complaint regarding the

residents' care, Plaintiff called Williams and told her "she was not welcome" at the home[2]

(Tr. 59).  The report states that Williams picked Plaintiff's driver's license picture from a

photo array (Tr. 59).

The OIG report states further that the sister and Representative Payee of another

client, Pauline Grueschow ("Grueschow") reported that Plaintiff identified herself as an

employee of the group homes but "often talked as if she [were] the owner of the homes" (Tr.

---

[2]

Williams noted she was informed that Plaintiff could be "moving clients around her
different homes to avoid contact with Adult Protective Services" (Tr. 59).  Williams noted
that a client at one of the homes complained that Plaintiff went through his mail and took
money from the envelopes because the client had "used too much hot water the previous
month" (Tr. 60).

61). Grueschow reported that her brother was under the care of Plaintiff from July through November, 2011 (Tr. 61). Grueschow noted that after she removed her brother from the group home, she received a reimbursement check signed by "Chinok Home Care-Cecilia Onyebuchi" (Tr. 61). Grueschow noted that prior to moving her brother into one of the above-referenced group homes, she was given Plaintiff's phone number by another individual (Tr. 61). She reported that Plaintiff herself transported her brother from one group home to another after he was threatened by another resident (Tr. 62). Grueschow reported that in every one of the 10 times she saw Plaintiff between July through November, 2011, she was the only group home agent/representative on site (Tr. 62). The same month, the brother of another resident reported that he had been interacting with Plaintiff regarding his brother's care from 2009 through May, 2012 (Tr. 63). In May, 2012, the sister of another resident reported that as of October, 2010, Plaintiff referred to the group home as "her home" (Tr. 67). The sister reported that Plaintiff drove a van which she used to transport residents (Tr. 67).

In June, 2012, the resident of one home reported that Plaintiff picked him up once a month to take him to the bank to cash his Social Security check then took $550.00 from the proceeds for rent (Tr. 63). The same month, another case manager reported that during a November, 2011 visit to the home, Plaintiff identified herself as the "provider" of the home (Tr. 64). The case manager (who worked with disabled individuals on a daily basis) "saw no evidence" that Plaintiff was disabled (Tr. 64). Yet another case manager reported that during a client visit, Plaintiff identified herself as the owner of the home and reported that she was about to take a residence shopping (Tr. 65). The same month, the owner of a barber shop next to one of the group homes stated that in December, 2011, Plaintiff had identified herself as the owner of the group home (Tr. 72).

In July, 2012, an individual living near the residence of Plaintiff and her husband reported that he had seen Plaintiff walking in the neighborhood without any apparent disability (Tr. 82). Another neighbor stated that Plaintiff had asked her to come work in a group home owned by Plaintiff (Tr. 82). She reported knowledge of Plaintiff's heart surgery from "many years ago" but that Plaintiff did not exhibit mental or physical disability (Tr. 82).

In August, 2012, the manager of another group home, Tony Smith ("Smith") reported that Plaintiff "appeared normal in every respect, including her mental capacity . . . ." (Tr. 66). The same month, a brother of one of the current residents stated that Plaintiff identified herself as the owner of the group home, noted that she owned two other homes, and was known to take the residents shopping (Tr. 71-72). The same month, a social worker who oversaw Plaintiff's own treatment following her bypass surgery reported that as of August, 2011 Plaintiff was seeking new residents for her homes (Tr. 73).

A group home employee also identified Plaintiff as the individual who paid him, adding that although Plaintiff hired cleaning staff, she did "some of the cleaning" herself (Tr 70). He reported that Plaintiff was in charge of dispensing the residents' medication (Tr. 70). A resident also identified Plaintiff as someone who worked at his group home (Tr. 70). The same month, the individual who prepared Plaintiff's 2011 tax returns stated that Plaintiff reported that she operated a company that sold products to home care services and that she did not inform him that she was receiving DIB benefits (Tr. 91).

In September, 2012, an OIG investigator interviewed an anonymous neighbor of one of the group homes who stated that Plaintiff was seen at the residence almost every day and regularly took residents of the home grocery and clothes shopping (Tr. 75). He stated that Plaintiff's daughter "was never around or involved . . . ." (Tr. 76). The same month, an employee of the one of the homes reported that Plaintiff would regularly transport residents

-8-

to the grocery store (Tr. 83). The employee reported that Plaintiff had her open an account at TCF Bank in the employee's name and the name of the group home listing the employee as a manager despite that the employee was not a manager and did not have any ownership interest in the business (Tr. 83).

The OIG report concluded that Plaintiff owned, managed, and operated the homes prior to applying for DIB, at the time of the application, and while receiving benefits (Tr. 56).

### C. The ALJ's Decision

The ALJ cited Plaintiff's July, 2011 application for DIB stating that she last worked in May, 2010 (Tr. 18). She noted that while Plaintiff later claimed that her work prior to becoming disabled included reselling clothes, the application did not include any resale work (Tr. 18). The ALJ noted that in September, 2011, Plaintiff reported to the SSA that she was looking for a job but was "never hired because of her health" (Tr. 18).

The ALJ cited Zwick's statements to the OIG that Plaintiff operated three group homes (Tr. 18). She cited case manager Williams' statement that Plaintiff introduced herself as the group home provider (Tr. 18). She cited the statements by the siblings of group home residents and employees of the homes indicating that Plaintiff identified herself as either "the owner or managing provider" of the homes and regularly drove residents to the bank (Tr. 19). She cited an employee's statement that Plaintiff did some of the cleaning of a group home by herself (Tr. 19).

The ALJ cited Plaintiff's June, 2012 interview by the OIG, noting gross inconsistencies between Plaintiff's claim that she did not participate in the management of the group homes and the reports of the case managers, residents' family members, and employees (Tr. 20).

Citing § 223(f) of the Social Security Act, the ALJ noted that the issue of whether Plaintiff experienced a physical disability for the relevant period was irrelevant given that the

benefits were fraudulently obtained (Tr. 20). The ALJ observed further that Plaintiff "received very little treatment" after applying for DIB and that a continuing disability review made fairly unremarkable physical and mental findings (Tr. 21). The ALJ affirmed the SSA's earlier decision to reopen the application and deny the application for benefits because Plaintiff "provided false statements in an effort to obtain disability benefits" (Tr. 21).

## STANDARD OF REVIEW

42 U.S.C. § 423(f) which governs the standard of review for termination of disability benefits states in relevant part that a recipient of benefits "may be determined not to be entitled to such benefits on the basis of a finding that the physical or mental impairment on the basis of which such benefits are provided has ceased, does not exist, or is not disabling only if such finding is supported by . . . . (4) substantial evidence," including evidence on the record at the time of the disability finding, or "newly obtained evidence which relates to that determination which demonstrates that a prior determination was in error." (Punctuation altered). The subsection shall not "be construed to require a determination that a recipient of benefits under this title ... is entitled to such benefits if the prior determination was fraudulently obtained or if the individual is engaged in substantial gainful activity . . . ." § 423(f)(1)(A).

Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is

-10-

substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## ANALYSIS

In her sole argument for summary judgment, Plaintiff argues, in effect, that the OIG report contains critical factual errors. *Plaintiff's Brief,* 21-22, *Docket #18,* Pg ID 1110. She contends that the OIG report refers in significant part to her group home activities prior to applying for DIB. *Id.* She also takes issue with the finding that she did not experience problems communicating in English because she was able to obtain a college degree after coming to the United States.[3] *Id.*

In finding that a claimant is no longer disabled, the medical basis for disability is irrelevant where "[a] prior determination or decision was fraudulently obtained." 20 C.F.R. § 404.1594(e)(1). In making the finding that "any prior favorable determination or decision was obtained by fraud . . . . the SSA must "take into account any physical, mental,

---

[3]
      Plaintiff's present brief does not include her former argument that the OIG report was "hearsay and double hearsay" (Tr. 1031). In any case, the argument would be unavailing here. "In Social Security . . . '[h]earsay ... is admissible up to the point of relevancy.'" *Hickey-Haynes v. Barnhart*, 116 Fed.Appx. 718, 724, 2004 WL 2725964, at *4 (December 1, 2004)(*citing Richardson v. Perales*, 402 U.S. 389, 410, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). "[H]earsay opinions should not be excluded unless 'the specter of questionable credibility and veracity is ... present'". *Id.* (*citing Perales* at 407, 91 S.Ct. 1420). As discussed in this section, Plaintiff has not presented plausible arguments challenging either the credibility of the OIG interviewees or the veracity of the report.

educational, or linguistic limitations (including any lack of facility with the English language) . . . ." *Id.*

Plaintiff notes that in the OIG report, her former husband was referred to as "her husband." *Plaintiff's Brief* at 21. She points out that she and her husband were divorced four years before the relevant period. *Id.* However, she does not state how referring to her former husband as her "husband" undermined the OIG's finding of fraud. Significantly, Plaintiff's own account of her marital status has been inconsistent. While Plaintiff states presently that she was divorced in 2006, she testified at the hearing that she was divorced in 2002. *Id.*; (Tr. 1041). During her OIG interview in June, 2012, Plaintiff referred to the individual as her husband then later stated that they were divorced in 2000 (Tr. 84-85). In July, 2012, she stated that her "husband and daughter" owned an adult care home (Tr. 53). Because the OIG's finding of fraud is wholly irrelevant to her marital status, the reference to the former husband as Plaintiff's "husband" does not affect the findings.

Plaintiff next argues that the individuals interviewed by the OIG were actually describing her activity prior to the alleged disability onset date of May, 2010. *Plaintiff's Brief* at 21-22. However, the OIG report contains numerous references to Plaintiff's activity subsequent to May, 2010. Case manager Williams stated that she met with Plaintiff in April, 2011 and later regarding the care of the residents (Tr. 58-59). The reports of the residents' family members indicate that Plaintiff was involved in the operation of the homes as late as May, 2012 (Tr. 63). Plaintiff identified herself as the "provider" of the home in November, 2011 (Tr. 64). Plaintiff identified herself as the owner of a home to a nearby business owner in December, 2011 (Tr. 72). Another source stated that Plaintiff was recruiting new residents as of August, 2011 (Tr. 73).

-12-

The OIG report also contradicts Plaintiff's testimony that her contact with the homes was limited to interacting socially with the residents on a sporadic basis and smoothing over occasional disputes between her former husband and others.  An employee of one home reported that Plaintiff did some of the cleaning chores and was in charge of organizing the residents' medication (Tr. 70).  A neighbor of one of the group homes observed that as of September, 2012, Plaintiff was at the home almost every day and regularly drove residents to the store (Tr. 75).  An employee likewise reported that Plaintiff regularly drove residents to the store (Tr. 83).  A number of interviewees stated that Plaintiff did not exhibit any physical or mental limitations (Tr. 64, 66, 82).

Plaintiff argues further that the ALJ erroneously cited a 2010 tax return showing business income, noting that she did not allege disability until May, 2010.  *Plaintiff's Brief* at 22.  However, this argument is defeated by the fact that the ALJ cited a 2011 (not 2010) tax return showing business income (Tr. 21).  The ALJ reasonably noted that Plaintiff's receipt of business income for 2011 stood at odds with her claim that she did not work after May, 2010 (Tr. 20-24, 1036, 1041).

Finally, Plaintiff contends that the ALJ "witnessed the difficulty" she experienced answering questions at the hearing.  *Plaintiff's Brief* at 22.  Plaintiff appears to dispute the ALJ's finding that she was "quite fluent in English." *Id.* (*citing* Tr. 21)).  Plaintiff is at least correct that  the ALJ was required to "take into account any physical, mental, educational, or linguistic limitations (including any lack of facility with the English language)" in finding that Plaintiff was not entitled to benefits due to fraud. § 404.1594(e)(1).

However, the transcript does not support Plaintiff's final contention.  First, substantial evidence supports the finding that Plaintiff did not experience linguistic limitations.  A February, 2013 consultative examiner found that while Plaintiff "spoke with a very

-13-

pronounced accent . . . she was typically intelligible" and "related cordially and communicatively" (Tr. 522). The examiner found Plaintiff's "English to be quite fluent, as she was raised in a nation whose official language is English . . . ." (Tr. 522). Second, my review of the hearing transcript does not indicate that Plaintiff experienced difficulty understanding or speaking English. Moreover, none of the individuals interviewed by the OIG mention that Plaintiff's ability to communicate was hampered by language barriers. The evidence shows that Plaintiff was able to engage in a number of activities requiring English fluency, including writing checks, applying to open new bank accounts, organizing the group home residents' medication, interacting with case managers, and recruiting new residents for her group homes.

Accordingly, the ALJ's determination that the initial disability determination was fraudulently obtained, well within the "zone of choice" accorded to the fact-finder at the administrative hearing, should not be disturbed by this Court. *Mullen v. Bowen*, *supra*.

## CONCLUSION

For the reasons stated above, I recommend that Defendant's Motion for Summary Judgment [Docket #21] be GRANTED and that Plaintiff's Motion for Summary Judgment [Docket #18] be DENIED.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and

-14-

Recommendation.  *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir.  1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir.  1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/ R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated: August 15, 2018

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was sent to parties of record on August 15, 2018, electronically and/or by U.S. mail.

s/Carolyn M. Ciesla
Case Manager to the
Honorable R. Steven Whalen

-15-